## LAW VS. GRANT.

FRAUD.  AGENCY.  (1) *Principal chargeable with fraud of agent, when.* (2) *Vendor, knowing sale to be effected by fraud of third party, not his agent, responsible.* (3) Aliter, *if fraud unknown to him.*

PRESUMPTION.  (4) *Of agency in such case.* (5) *Overborne by that of innocence.* (6, 7) *Third party not deemed agent in this case.*

VERDICT.  (8) *In equity cases, merely advisory.*

1. If an agent effects a sale of land of his principal by false representations or other fraud, without the authority or knowledge of the principal, the latter is chargeable with such fraud in the same manner as if• he had known or authorized it.

2. If the vendor of land knows *when he effects the sale*, that the purchaser has been induced to buy by the false and fraudulent representations of a third person, he is responsible for the fraud, though such third person was *not his agent.*

3. But if the sale be made by the vendor without any false representations by himself or agent, and without knowledge that such representations have been made by any other person, he may assert his rights, under the contract of sale (as by foreclosing a mortgage for purchase money), notwithstanding any knowledge of such representations (made by one not an agent) acquired by him after the sale, and after he had parted with a valuable consideration — as by a conveyance of the premises.

4. The fact that a third person, by false representations, induced the purchaser to buy the land, would perhaps justify the court in *presuming* that he acted as agent for the vendor, in the absence of any other adequate explanation of his conduct.

5. But there is always a presumption in favor of innocence; and if the court can perceive any reasonable hypothesis, consistent with the facts in evidence, explaining the conduct of such third person, without implicating the vendor in the fraud, it is bound to adopt such hypothesis.

6. Upon the evidence in this case, this court is of opinion that defendant was induced to purchase plaintiff's land by false representations made by a third person; but that the latter was not plaintiff's agent, and that plaintiff, when he effected the sale, did not himself make such representations, and was not aware that they had been made.

7. If the vendor of land, when he effected a sale at an extravagant price, knew that the estimate of the value of the land formed by the purchaser and others was based upon their belief in the power of a certain person to detect mineral veins by walking over the surface of the land, and other like beliefs, and if he fixed a high valuation on his land in consequence of those facts, this will not relieve the purchaser from payment of the agreed price, where the vendor himself made no false representations in person or by agent, and did nothing to cause or strengthen the false opinions upon which the purchaser acted, but expressly declined to sell the premises as mineral land.

8. In the trial of an equitable action, the verdict of a jury on questions of fact is merely advisory; and this court, on appeal, determines the case on the weight of evidence, giving to the verdict the effect merely of a finding by the trial court; and the correctness of the instructions given to the jury is immaterial.

APPEAL from the Circuit Court for *La Fayette* County.

Action to foreclose a mortgage. Defense, fraud in inducing the plaintiff to contract the debt which it was given to secure.

In December, 1867, the defendant purchased of the plaintiff a tract containing 400 acres of land in La Fayette county, and agreed to pay therefor $100 per acre, or $40,000 for the whole tract. The defendant paid the plaintiff, in cash, at the time of such purchase and on account thereof, $15,000, and gave his five promissory notes for $5,000 each and ten per cent. interest, for the residue of the price. He also executed to the plaintiff a mortgage on the lands so purchased, to secure the payment of such notes. Three months later, the defendant paid two of the notes. The other three notes remaining unpaid, this action was brought, in 1873, to foreclose such mortgage.

The complaint is in the usual form. The answer is to the effect that the land was only worth $32.50 per acre, or $13,000 for the whole tract, at the time the defendant purchased it,

and that he was induced to make the purchase at $100 per acre by certain false and fraudulent representations made to him by the plaintiff and his nephew and agent, one Richard S. Law; that the defendant, who resided in Mobile, Ala., desired to purchase a tract of land in the southwestern portion of this state, proved to contain lead ore, for the purpose of mining thereon, and for no other purpose; and that Richard S. Law, knowing that fact, and acting in the matter as the agent of the plaintiff, represented to one John McDougall of 'Chicago, "the agent, adviser and friend of the defendant," and requested McDougall to communicate such representations to the defendant, that (quoting from the answer) "the real estate described in the complaint was, and had been proven to be, first-rate lead mining land, and that there was a large vein of mineral lead ore which had been discovered upon said land, at or near a large spring of water thereon, and at a depth of about twenty feet from the surface of the ground, and that said vein of mineral would produce, and there could be worked therefrom, lead ore and mineral of the value of five thousand dollars each and every month, and that said vein of mineral could be opened so as to produce mineral at the rate aforesaid within thirty days from the commencement of mining operations upon said land; that fine specimens of lead ore were constantly being thrown out by the water in said spring, which gushed out from twenty feet below the surface of said land, to the surface, which mineral came from the aforesaid spring; that the said R. S. Law, to prove the existence of said vein of lead ore, had heretofore, near the said spring of water, with an artesian well drill or borer, drilled or bored a hole in the rock, and had bored into and struck a fine drift or sheet of lead ore mineral; that the said Richard S. Law had for a long time been of the opinion that this tract of land was valuable lead mineral land, and that, by boring therein as aforesaid, he had verified his former opinion, and at that time knew that said vein of mineral was there, and that a valuable mine could easily be developed thereon; "

that believing such representations to be true, McDougall immediately wrote to the defendant at Mobile, communicating the same to him ; and that the defendant, upon the receipt of the communication from McDougall, also believed such representations, and, relying implicitly upon them, came to Wisconsin at once and made the purchase. The answer negatives the truth of such representations and of other alleged false and fraudulent statements made by Richard S. Law to McDougall, and repeated in the letter of the latter to the defendant.

The proofs show that this letter was submitted by McDougall to Richard S. Law, before it was forwarded, and was approved by him. The letter is of sufficient importance in the case to justify its insertion here at length. It is as follows :

"REVERE HOUSE, Chicago, December 4. BRO. GRANT— *Dear Sir:* Our friend *Mr. Law* has returned with reports of the 400 acre tract of which I wrote you. It is a fine prairie farm, nearly all in cultivation, with good improvements, good dwelling and fine orchard, fine fence timber three miles off, within five miles each of Shullsburg and Apple Creek Railroad Station. The projected railroad goes within half a mile of it, and the station will be only one mile off. The farm is leased for two years from 1st April next, until which time we could not obtain possession of it, but could go on and put up shanties and work the ore as fast as we pleased. *Mr. Law* is confident we could take out ore in thirty days from the beginning, and make it then produce $5,000 worth monthly upon the vein twenty feet from the surface, that the yield will refund an advance in a few months, and furnish capital to run the main level which we would begin. Fox regarded it as the richest mine in the country, and tried to arrange to get it for himself and Story, but *Law* had secured the refusal. There is a spring yielding six barrels of water an hour, gushing out twenty feet from the surface, and throwing out fine specimens of lead ore. Fox went over it, and pointed out a place where there was a rich deposit. *Mr. Law* went to the trouble of boring there,

and opened into an opening that struck the spring's vein and a splendid drift. He had the promise of the land at $100 per acre; but after he bored the owner was disposed to advance price, and would to any one else. *Mr. Law* had thought he could get it lower, but cannot now. His price and terms are $100 per acre, $40,000, in fee simple, the lessee to retain possession of the farm for the two years, at $50, or $20,000 for the whole mineral, he retaining the surface of the farm. Terms in either case $15,000 down cash, and the remainder (whether it be $5,000 or $20,000) in annual payments of $5,000 each, with ten per cent. interest from date; he giving us a fee simple title at once, if we agree upon taking surface as well as lead, at $40,000. In this case we will have 400 acres for $40,000, instead of 200 acres for $44,000, better improved and in a better location, that makes the land more convenient and valuable, and plenty of time to pay; and then *Mr. Law* thinks that returns in thirty days after beginning will be double that of the $44,000 mine, paying as we go; that a small engine and pump, both costing $2,500, will lift all the water off the ground till we get an adat [adit], which adat, Fox says, will, within a quarter of a mile, tap a rich ridge, and at one half drain generally. So certain of *Mr. Law's* facts am I, that I have not gone to see, waiting for you. Now, to secure this, the trade must be closed and $15,000 paid by the 24th December, before Christmas, sure. We propose you take three-fifths, $24,000, and we two fifths, $16,000, making the $40,000. You may, perhaps, remember that in going to Apple Creek Station from Shullsburg, we came to a lane that crossed our road at right angles, and turned suddenly to the left; well, it is just before we get to that point, and off a mile to the left, that lies this 400 acre tract of beautiful rolling prairie, with ridges or ribs running through it like on the $44,000 tract. My only fear was of the too great abundance of water in the spring at twenty feet from surface. But *Mr. Law* regards it as a recommendation, as showing the enemy (if an enemy) in

front and in hand, regarding the spring not only as a useful drain and so much water as desirable if lowered into the adat, but he regards it (and so does Fox) as the best evidence of large and open caves and rich deposits through which it runs. I suppose it is so, but a small engine and a good pump will soon displace it, so near the surface as it is. Now, sir, I advise that you come up at once and choose between the two places, or as soon as you can, and by all means writing at once your views, if the facts, on your coming, bear out this report. If you conclude to choose this last named place upon coming (if it is as we think), perhaps your writing so, and that you will be here by the 20th inst., will answer so that it can be conditionally closed. The Silverthorne mine is doing well. As in the other trade, we would expect you to advance now the $15,000 cash as you proposed to do, and have all the benefit in the way of interest, etc. In answer please address immediately Richard S. Law, both to care of Revere House here, and at Shullsburg, La Fayette county, Wisconsin, for fear it miss him. Yours very truly, etc.            JNO. McDOUGALL.

"I may reach N. O. before you start, if not before the 15th inst., but don't wait for me. I'll return here soon. This is my address here at the Revere House."

It may be stated here, by way of explanation, that Fox, who is named in the above letter, is a person who is reputed to possess the power or faculty of detecting mineral in the earth by walking upon the surface above where the same is deposited.

The answer further alleges that after the purchase, the defendant, at an expense of several thousand dollars, fully tested the land for mineral; that such tests demonstrated that it does not contain mineral; that thereupon the defendant tendered the plaintiff a conveyance of the land, duly executed, and demanded the $25,000 which he had paid on account of the purchase; and that the plaintiff refused to accept the conveyance or refund the money.

The defendant brought an action against the plaintiff to rescind the contract of purchase and sale of the land, for fraud, and to recover what he had paid on account of it, and obtained judgment in the action, although not in accordance with the demand for relief. On appeal, this court reversed the judgment, but did not determine any of the questions involved in the present case. 29 Wis., 99. It was stated on the argument that such action had been discontinued.

The answer also contains a counterclaim for the amount paid on account of the purchase and the cost of testing the land for mineral, over and above the amount due on the notes which the mortgage sought to be foreclosed was given to secure. The court found that such excess was $34,900. But, at the close of the trial, the defendant waived the excess of such counterclaim over and above the amount due on the notes and mortgage.

The testimony is sufficiently stated in the opinion. Certain questions of fact were submitted to a jury, and they found, among other matters not material to the case on this appeal, as follows: 1. That the plaintiff induced the defendant to purchase the mortgaged premises by reason of the false and fraudulent representations alleged in the answer. 2. That the value of the land, at the time the defendant purchased it, was $30 per acre. 3. That the land is not valuable for mineral purposes. The circuit court approved and confirmed the finding of the jury, and in addition, or subsidiary thereto, found the following facts: "The representations made by R. S. Law unto the defendant as to the land purchased, made previous to and at the time of the sale, were so made by the said R. S. Law for and in behalf of the plaintiff; and in the negotiation of such sale, R. S. Law acted wholly for and in the interest of the plaintiff, which the plaintiff then well knew, or, if he had no positive knowledge on the subject, all the facts and circumstances attending the transaction should and must have satisfied any reasonable man that the said R. S. Law was so acting wholly for the plaintiff. All pretenses made by R. S. Law, that he desired

to become a copurchaser of such real estate with the defendant and McDougall, were false, and were intended by him to mislead the defendant by inducing him to believe more implicitly the representations said R. S. Law might make, he (the defendant) believing his and the said R. S. Law's interests in the matter were identical. &ast;   &ast;

"Within a reasonable time after the defendant discovered and had knowledge that the representations made to him by the said R. S. Law, for the plaintiff, as aforesaid, as to mineral discoveries having been made upon said land, and as to the mineral qualities of said land, were false and were fraudulently made, to wit, on the 19th day of May, 1869, the defendant informed and made known to the plaintiff that he had been induced by fraudulent means, and the fraudulent and false statements of said R. S. Law, made as aforesaid for and in the interest of the plaintiff, to purchase said real estate at the price aforesaid, and then tendered to said plaintiff a good and sufficient deed of conveyance of the lands described in the complaint, executed by said defendant to the plaintiff, and demanded that the plaintiff take the said conveyance and refund to the defendant the sum of $25,000, paid by him of the purchase price of said land, and also that the plaintiff surrender to the defendant the three promissory notes sued on in this action, all of which the plaintiff then and there refused to do. Since said offered rescission of said contract by the defendant, and knowledge to the plaintiff of the fraudulent conduct of the said R. S. Law in the plaintiff's behalf in making such sale, the plaintiff has constantly claimed, and now claims, the full benefit of the contract of sale of said land made with the defendant."

The plaintiff appealed from the judgment dismissing the complaint with costs.

*Wm. E. Carter*, for appellant, argued upon the facts in the case: 1. That no false representations were made by R. S. Law to *Grant*. 2. That R. S. Law was not the agent of the plaint-

iff. 3. That the plaintiff had no knowledge of the representations alleged to be fraudulent, at or before the sale. 4. That *Grant* did not rely upon the representations which were made, if they were made. To the point that the declarations of R. S. Law, not part of the *res gestæ*, were improperly admitted in evidence, he cited Dunlop's Paley on Agency, 256, 268 ; *Packet Co. v. Clough*, 20 Wall., 528 ; *Hazelton v. Union Bank*, 32 Wis., 340. And that such declarations were inadmissible on the theory of a conspiracy. 1 Greenl. Ev., § 111. Fraud is never presumed, and a court of equity will, if the facts are consistent with pure intentions, refuse to infer fraud from them. *Steele v. Kinkle*, 3 Ala., 352.

*M. M. Cothren* and *P. A. Orton*, for respondent, as to what constitutes fraud, cited Story's Eq. Jur., 184; 1 Mad. Ch., 255, 256; *Waltham v. Broughton*, 2 Atk., 43; *Alden v. Gregory*, 2 Eden, 285; *Trenchard v. Wanley*, 2 P. Wms., 166; *Earl of Chesterfield v. Jansen*, 1 Atk., 351; *Broderick v. Broderick*, 1 P. Wms., 239. As to the presumption of fraud from inadequacy of price, they cited *Butler v. Haskell*, 1 Dess. Ch., 697; and as to fraud by misrepresentation, *Smith v. Mariner*, 5 Wis., 551; *Kelly v. Sheldon*, 8 id., 258; 1 Story's Eq. Jur., § 183, note 3. Insisting that the evidence showed that R. S. Law acted as agent, and sustained the verdict on that theory, they contended that a more liberal rule should be applied to this case. If an agent sells property for the principal, and the principal accepts the contract, he thereby becomes answerable for all the means adopted by the agent in making the contract, whether known by him at the time or not. This position may not stand so much on the doctrine of ratification, as that the principal, having received the benefit of the agent's fraud, cannot retain such benefits without being answerable for the fraud. He undoubtedly, when informed of the fraud, may rescind the contract, placing the other party in *statu quo;* but after such knowledge, he becomes guilty, if he refuses to make restitution, and insists on retaining the fruits of his agent's dishonesty. 1 Story's Eq.

Jur., § 193; *Fitzsimmons v. Joslin*, 21 Vt., 140–142; *Fuller v. Wilson*, 4 Ad. & Ell., N. S. 213; *Hartopp v. Hartopp*, 21 Beavan, 259; Adams' Eq., 3 Am. ed., 369; *Bennett v. Judson*, 21 N. Y., 238; *Elwell v. Chamberlain*, 31 id., 619; *Low v. Conn. R. R. Co.*, 46 N. H., 284; *Morton v. Scull*, 23 Ark., 289; *Udell v. Atherton*, 7 Hurl. & Nor. (Eng. Ex.), 172; *Sharp v. New York*, 40 Barb., 256; *Ballston Spa Bank v. Marine Bank*, 16 Wis., 133; *Paine v. Wilcox*, id., 202, 217; *Beal v. Ins. Co.*, id., 241. And, though no agency existed, yet the vendor can not retain the fruits of the fraud of another. He may innocently take, but can not retain after knowledge of the fraud. *Huguenin v. Baseley*, 3 Lead. Cas. in Eq., 103–125; *Whelan v. Whelan*, 3 Cow., 577. It matters not that other influences operated on the mind of the purchaser, if the *controlling inducement* was the fraudulent representations of R. S. Law. *Hubbard v. Briggs*, 31 N. Y. 532.

*S. U. Pinney*, of counsel for respondent, also filed an argument upon the facts.

LYON, J. The cases cited by the learned counsel for the defendant abundantly demonstrate the rule of law to be, that if Richard S. Law acted as the agent of the plaintiff in negotiating the sale of the mortgaged premises, the latter is responsible for all the means employed by his agent to effect the sale. If the agent effected it by means of false representations or fraud of any other description, although without authority from the plaintiff to do so, and although the plaintiff was entirely ignorant that he had done so, the legal status of the plaintiff is precisely the same as it would have been had he made the false representations or committed the fraudulent acts to the same end, in person.

Again, if the plaintiff knew, when he sold the premises to the defendant, that the latter was induced to make the purchase by the false representations of Richard S. Law, and failed to inform him that they were false, he is in like manner respon-

sible for the fraud, although Richard S. Law was not his agent. But it is claimed (and the circuit court seems to have adopted that view), that although R. S. Law was not the agent of the plaintiff in negotiating the sale, and although the plaintiff made no false representations in respect to the premises, and did not know at the time of the sale that R. S. Law had done so, still, on being informed, nearly a year and a half after the sale, of the fraud committed by the latter, the plaintiff could not thereafter be permitted to assert any further rights under the contract of sale, and hence is not entitled to a foreclosure of the mortgage in suit. Cases to support this doctrine were cited, which, together with many others of like character, have been carefully examined and considered. But they are all cases of wills or settlements, or other voluntary conveyances not founded on valuable considerations, and hence are unlike the present case. The correct doctrine is briefly and clearly stated by the Vice Chancellor Sir WM. PAGE WOOD, in *Scholfield v. Templer*, Johns., 156. He says: "This case is brought within the broad principle, that no one can avail himself of fraud. As it was held in *Huguenin v. Baseley*, 14 Ves., 273, and the other cases cited in argument, where once a fraud has been committed, not only is the person who has committed the fraud precluded from deriving any benefit from it, but every other person is so likewise, *unless there has been some consideration moving from himself.* Where there has been consideration moving from a third person, and he was ignorant of the fraud, there such third person stands in the ordinary condition of a purchaser without notice ; but where there has been no consideration moving from himself, a third person, however innocent, can derive no sort of benefit or advantage from the transaction" (p. 162–3).

In the present case there was a valuable consideration moving from the plaintiff, to wit, the conveyance of the mortgaged premises to the defendant; and hence, within the rules above stated, the plaintiff (being himself free from fraud) cannot be held answerable for the fraud of R. S. Law, and the defendant

cannot successfully allege such fraud as a defense to the mort-
gage unless R. S. Law was the agent of the plaintiff, or, he not
being such agent, unless the plaintiff knew at the time of the
sale that the defendant was making the purchase on the
strength of the fraudulent representations made to him by R.
S. Law.

It only remains to determine what facts were proved on the
trial, and to apply the foregoing principles thereto. And it
should be here observed that, the action being an equitable one,
the verdict of the jury on the question of fact submitted to
them is merely advisory, and we must determine the case upon
the weight of evidence, as all other equitable actions are deter-
mined, giving no more weight to the verdict than should be
given to a finding of the same facts by the court without the
intervention of a jury. *Jackman Will Case*, 26 Wis., 104;
*Chapin Will Case*, 32 id., 557. If sustained by the evidence,
the verdict is not vitiated by erroneous instructions; if not so
sustained, correct instructions will not save it. Hence the in-
structions given to the jury become quite immaterial, and it is
unnecessary to review them, or to make further reference to
them.

The first question of fact to be determined is, Was the de-
fendant induced to purchase the mortgaged premises at the
agreed price by any false representations respecting the same
made to him by R. S. Law, either directly or through his
friend and adviser, McDougall? The defendant testified that
he made the purchase on the strength of McDougall's letter to
him of December 4th, which it will be remembered was read
and approved by R. S. Law before it was forwarded to the de-
fendant. That letter contains no positive statement that R. S.
Law found mineral when he bored near the spring; but he told
McDougall that he then struck a sheet of lead, and it is very
evident that the letter was intended to, and did impress the de-
fendant with the idea that the boring had disclosed the exist-
ence of mineral in the land in large quantities. Whatever

ambiguity there may be in the phraseology of the letter in this respect, it was removed by the statement made by R. S. Law to the defendant when he came to Wisconsin to make the purchase, that mineral was found by the former in the hole which he bored near the spring. We have no difficulty in finding from the evidence that one of the inducements which led the defendant to make the purchase was the representations of R. S. Law that he had found mineral in the land which indicated the presence there of a valuable mine. That this representation was false is not disputed. It is unnecessary to determine whether R. S. Law made any other fraudulent representations, or committed any other frauds, to induce the defendant to purchase the land.

The next question of fact, and the most difficult one in the case, is, Was R. S. Law the agent of the plaintiff in negotiating a sale of the land to the defendant? If he was, it necessarily follows, as has already been stated, that the plaintiff is responsible for the false representation made by his agent.

There is no positive testimony of the existence of such agency, and the plaintiff in his testimony denies it fully. One Russell testified that the plaintiff told him, that if his land was mining land, R. S. Law could sell it for $50 per acre. He does not give the date of this conversation. The plaintiff testified that the conversation took place in 1865 or 1866, and gives a different version of it. He says, "I told Russell that R. S. Law had said to me if I could find mineral on my land, I could sell it at $50 per acre." The plaintiff also testified as follows: "Not one dollar of this money (the purchase money) was paid to R. S. Law directly or indirectly. There was no understanding that he was to get any of this money. I had no knowledge that he was trying to sell the land; no knowledge of any representations he made about it. I only know that he wanted to buy the land himself." It was also proved that R. S. Law paid out $250 a day or two after the sale, and $40 several months thereafter, but there is no competent evidence showing

or tending to show from what source he obtained these sums of money.

This is all of the testimony bearing directly upon the question of agency, except that Dr. Lee, a witness for plaintiff, testified, under objection, that R. S. Law told him (the plaintiff not being present), that he had negotiations pending about the sale of the place, and that he was to have all he could make over $14,000 or $16,000. Also, that after the sale was made, he told the witness that he was to have half of the excess of the purchase money over a certain sum. This testimony of Dr. Lee was clearly inadmissible, and must be disregarded. The rule on this subject is thus stated in *Hazleton v. The Union Bank of Columbus*, 32 Wis., 34: "The admissions or representations of an agent, while engaged in any particular transaction for his principal, made in regard to such transaction, may be received in evidence against the principal in a controversy concerning such transaction. But, to be received, they must constitute a part of the *res gestæ* in the course of the agent's employment about the matter in question; they must accompany the transaction or the doing of the business, and must be within the scope of the delegated authority" (p. 48). The alleged admissions to Dr. Lee were not made in the course of the employment (if there was an employment or agency), were not part of the *res gestæ*, and hence cannot be received in evidence.

But it is argued that R. S. Law had no adequate motive to deceive the defendant and mislead him into the purchase of the land at an exorbitant price, unless he was acting in the interest of the plaintiff, and pursuant to some understanding with the plaintiff that he was to be paid largely out of the proceeds of his fraud. If this proposition is true, it goes far to establish the relation of principal and agent between the plaintiff and R. S. Law. If we can find from the evidence no other reasonable hypothesis of the motives which prompted R. S. Law to perpetrate the frauds, than that he was to profit by the sale in the manner claimed, we shall probably be justi-

fied in finding the proposition true.   But if there is any other
reasonable hypothesis sustained by the evidence, consistent
with the innocence of the plaintiff — one which satisfactorily
explains the conduct of R. S. Law, without implicating the
plaintiff in his fraud by raising the presumption of agency, — it
should be adopted.   The proposition demands careful con-
sideration.   To discuss it, and other questions in the case,
intelligently, a statement of some facts not before mentioned,
which we think are established by the evidence, is necessary.

   At the time the defendant purchased the mortgaged premises,
and before, there was much activity, perhaps excitement, in
mining operations in the mineral regions of Wisconsin and
elsewhere.   Lands supposed to contain mineral were held, and
some such lands in the vicinity of the mortgaged premises
were sold, at prices which now seem exorbitant.   Such activity
or excitement was doubtless increased by the fact that a class
of people made their appearance in the mining regions, who
claimed to possess the power or faculty to discover the presence
of mineral in the earth by means of certain mental or physical
impressions or phenomena produced upon them by passing
over the place where the mineral is deposited.   A notable
member of this class was Fox, who is mentioned in the letter
from McDougall to the defendant.   Doubtless very many
persons honestly believed that he possessed this faculty or
power to a remarkable degree.   To such persons, his assertions
that mineral products existed in certain specified places, im-
ported absolute verity.   We see no reason to doubt that R. S.
Law was one of these.   It is in proof that he is a strong
believer in spiritualism, and there was much in his conduct to
show that at the time of the sale he fully believed that Fox
possessed this power to discover the location of mineral
deposits with unerring accuracy.   It is very apparent that the
defendant was strongly indoctrinated in the same belief.   Sub-
stantially (although cautiously and with qualifications), he
admits it in his testimony.   Yet there is sufficient evidence to

satisfy us, that his belief in the existence of such faculty or power, and that Fox and others possessed it, was strong enough to control his actions, or at least to influence them to a considerable extent. If such belief did not blind his judgment, it certainly greatly impaired his prudence and discretion. McDougall also, to a greater or less extent, entertained the same belief.

Before the plaintiff knew the defendant or had ever heard of him, Fox went upon the mortgaged premises and pronounced them rich in mineral deposits. He pointed out to the plaintiff the precise location of those deposits. Fox and R. S. Law (and perhaps Storey) thereupon proposed to buy the land on credit, and to pay therefor $25,000. The plaintiff declined the offer, without naming a price for the land. A day or two afterwards he offered to sell to R. S. Law for $100 per acre, $15,000 of the purchase money to be paid at the time of the sale. R. S. Law was unable to comply with the terms, and thereupon opened negotiations with the defendant, through McDougall, to become interested with him and McDougall in making the purchase. On his way to Wisconsin to conclude the purchase, the defendant passed through New Orleans, and there consulted a woman who professed to be a clairvoyant (and whom he had consulted on other subjects), concerning his proposed purchase. This woman seems to have favored the purchase of the Law farm rather than the $44,000 tract mentioned in McDougall's letter. In his testimony, however, the defendant disclaims that he was influenced by what the woman said to him.

The defendant reached Shullsburg, in the vicinity of the mortgaged premises, on Saturday, December 21, 1867, and found there R. S. Law and a woman from Chicago named Allen, who, the defendant says, was a medium. It is probable that R. S. Law procured the attendance of this woman on that occasion. A number of persons, among whom were the parties, R. S. Law and Mrs. Allen, went upon the land. Mrs. Allen

verified the statements of Fox by walking over the land. In answer to a question by the defendant, when the parties were near the hole which had been bored by R. S. Law near the spring, the plaintiff told him that no mineral was found in that hole. This is proved by the testimony of several witnesses, although the defendant denies any recollection of such conversation. Indeed, so thoroughly impressed was the defendant with the idea derived from McDougall's letter (but not from anything said by the plaintiff), that the plaintiff desired to withdraw his offer to sell the land at $100 per acre, that he would not (as he testified) have paid any attention to anything the plaintiff might have said against the value of the land. He subsequently testified, however, that had he heard the plaintiff say that no mineral was found in the hole, he would. have given some attention to the statement. The defendant avoided conversation with the plaintiff concerning the land ; he did not exact or call for any statements from the plaintiff relative to it; neither did he require the plaintiff to verify the representations made by R. S. Law, or inform him what those representations were. Referring to a time when the negotiations were still pending, the plaintiff testified as follows : " *Grant* said he understood my price was $100 per acre, and remarked, that was a high price for land *not proved to be mineral land.* I said it was high, but it had other qualities. I had proved it was a good stock farm. Water power on it, and stone quarry. I said there was a possibility of mineral, from my ideas of mineral in that section of the country. I said I would not sell it for mineral land, not having proved it, and not being a miner. He said it made no difference about my not having proved it; that he believed he knew more about the land than I did. Said he bought the land on his own judgment." The above testimony, or the more material portion of it, is corroborated by other witnesses, and must be taken to be true, notwithstanding the denial thereof by the defendant. The sale was completed, the deed, notes and mortgage exe-

cuted, and the $15,000 paid, on the same day that the above transactions occurred.

Subsequently, R. S. Law went to Chicago and assisted the defendant to select a pump to be used in mining on the land. Sometime afterwards (but at what particular time does not appear), McDougall informed the defendant that, because of losses in oil speculations, he would be unable to take an interest in the mortgaged premises. The defendant replied that if McDougall could not go into the enterprise, R. S. Law could not. McDougall communicated such reply to the latter, who expressed his regret, but said there were other chances as good; and never thereafter applied to the defendant for an interest in the premises.

It is believed that the foregoing are all of the facts necessary to be considered to enable us to determine whether there is any reasonable hypothesis consistent with the innocence of the plaintiff of knowledge of the frauds perpetrated by R. S. Law on the defendant, or of such participation in the acts of R. S. Law or connection therewith as will establish the relation of principal and agent between them.

After most careful consideration of the evidence, we are impelled to the conclusion that such a hypothesis may reasonably be predicated upon it. We think there are as good reasons for believing that R. S. Law perpetrated the fraud upon the defendant for his own purposes, entirely irrespective of the plaintiff, as that he did so pursuant to an understanding with, and to advance the interests of, the plaintiff. It is a reasonable theory of the case, that R. S. Law really believed that the land contained rich deposits of mineral, that he was anxious to obtain an interest in it, and that his frauds upon the defendant were for the purpose of obtaining such interest by inducing the defendant to become the purchaser, and not because he had any agreement with the plaintiff to share in the proceeds of the sale.

The faith of the defendant and R. S. Law in the powers of

Fox, Mrs. Allen and others of the same class, may reasonably be considered the key to the whole transaction. It may explain the conduct of R. S. Law and the marvelous credulity and want of discretion of the defendant, without impeaching the honesty of the plaintiff. It is our unmistakable duty to accept the explanation, because it is reasonable and because it is in favor of innocence. We conclude that the proofs fail to show that R. S. Law acted as the agent of the plaintiff in negotiating the sale of the mortgaged premises to the defendant.

The remaining question to be determined is, whether the plaintiff, at the time of the sale, knew that the defendant was induced to purchase the land by the false representations of R. S. Law. This question requires no extended discussion. Much that was said in the consideration of the question of agency, is applicable to it, and need not be repeated. It is sufficient to say here, that the denial by the plaintiff, in his testimony, of any such knowledge or notice has not been successfully controverted by the defendant. Aside from the mere fact that the plaintiff demanded and received what now seems to have been an exorbitant price for his land, the case seems entirely destitute of evidence tending, even remotely, to prove that the plaintiff then had any knowledge or suspicion that R. S. Law had perpetrated a fraud of any kind upon the defendant. Under all of the circumstances of the case, we are not authorized to reject the positive denial of the plaintiff.

A few observations, not pertinent to the discussion of the questions of fact above considered, but relating rather to the personal connection of the plaintiff with the contract of sale, will conclude this opinion. The plaintiff doubtless thought that R. S. Law and the defendant had extravagant notions of the value of his land; he probably knew that their valuation was based on their belief in the power of Fox and others to detect the location of mineral deposits; and he fixed a high valuation on his land in view of those facts. But it does not appear that he did any act or spoke any word to cause or

strengthen such opinion. On the contrary, he frankly told the defendant that no mineral had been found in the land except a little piece found in the spring (and the proof is that some mineral was found in the spring), and he expressly declined to sell the land as mineral land.

It frequently happens that the market values of stocks and other kinds of property are temporarily inflated, by means of the grossest frauds, far above intrinsic values. Yet no one will claim that contracts for the sale and purchase thereof at such inflated prices, by parties not concerned in the fraud, can be successfully impeached. This seems to be a case within the same principle. The defendant was made to believe that he knew the value of the land better than did the owner. He acted upon that belief, and bought the land at an exorbitant price. His opinion was based partly upon false assertions of fact made by R. S. Law, and for which the plaintiff was in no manner responsible, but mainly, in our opinion, upon his absurd belief in the powers of Fox. Neither was the plaintiff responsible for that belief, but sold his land for the price the defendant was willing to pay for it. It turns out that the belief of defendant is unsound ; that he spent his money and incurred obligations upon the strength of a false theory or doctrine, being incited 'thereto by the false statements before mentioned. On what principle can a court of equity relieve him from the consequences of his gross folly and want of common discretion and prudence ? The question has already been answered. In order to entitle himself to relief, we have seen that he must connect the plaintiff with the alleged fraud by showing that it was perpetrated by the plaintiff or his agent, or, if by a person not the agent of the plaintiff, that the latter had notice of the fraud at the time of the sale. The defendant has failed to prove either of these propositions, and, however reluctant we may be to do so, we must hold that he has failed to establish his counterclaim.

A new trial will be of no service to the defendant, unless he

can produce additional evidence of agency or notice of the fraud, as the case may be. If he satisfies the circuit court, by affidavit or other competent proof, that on another trial he will be able to prove a defense to the action, we think that court should grant a new trial. Otherwise, the plaintiff should have the usual judgment of foreclosure and sale.

*By the Court.* — The judgment of the circuit court is reversed, and the cause remanded for further proceedings in accordance with this opinion.