JOSEPH S. ELLISON, Appellant, v. J. G. STOCKTON et al.,
Appellees.

**PRINCIPAL AND AGENT: Authority to Sell or Find Purchaser.**
1 Naked authority to sell land at a specified price, or simply to
find a purchaser, embraces no implied authority to the agent
to make representations as to the character or condition of the
land.

**FRAUD: Unpleaded but Proved Fraud.** Unpleaded fraud, though
2 proved, affords no ground for relief.

**FRAUD: Examination as Excluding Reliance on Fraud.** An un-
3 obstructed examination of property by a prospective vendee,
prior to purchase, does not necessarily exclude reliance on fraud-
ulent representations.

**VENDOR AND PURCHASER: Vendee Injured by Unauthorized**
4 **Fraud.** A vendee of land may not maintain an action against
the vendor for damages for *deceit* because of the false and
fraudulent representations of the vendor's agent, when such
representations were *wholly* unauthorized by the vendor, and
were unknown to the vendor until after the sale was consum-
mated; but such vendee may, within a reasonable time after
the closing of the sale, bring such fraud to the attention of the
vendor and demand rescission, and, if rescission be refused, may
maintain an action against the vendor to recover the differ-
ence between the actual value of the land and the amount he
agreed to pay for it. Vendors may not repudiate the unauthor-
ized fraud of their agents *and retain the fruit of the rascality.*

WEAVER, J., concurs in reversal, but dissents to portions of
discussion.

*Appeal from Linn District Court.*—Milo P. Smith, Judge.

January 20, 1919.

Rehearing Denied April 10, 1919.

Action to recover damages for false representations in the sale of land. Opinion states the case. Directed verdict for the defendants. Jugdment on the verdict. Plaintiff appeals.—*Reversed.*

*Redmond & Stewart,* for appellant.

*E. A. Johnson* and *F. L. Anderson,* for appellees.

Gaynor, J.—In September, 1914, defendants were the owners of a certain tract of farm land, and listed the same for sale with Hall & McCall. Hall & McCall were real estate agents, whose business it was to negotiate sales for others, and to procure purchasers for land owned by others. These facts were known to plaintiff. The defendants had owned this land for about five years before listing it. Some time in September, "Train" McCall, one of these agents, called the plaintiff by phone, stating to him that he had a farm northwest of Cedar Rapids which he wanted to sell the plaintiff, if the plaintiff wanted to buy, and asking plaintiff to come in. Two or three days thereafter, the plaintiff came to McCall's home at Lisbon. He came about 8 o'clock in the morning. He then went immediately, in company with these agents and his son, to visit the farm. They left McCall's home about 8:30, and, after stopping some time on the way, reached the farm at about half past ten. The land in controversy is described as follows: The south one half of the northwest quarter, the southwest quarter of the northeast quarter, the north one half of the southwest quarter, and the northwest quarter of the southeast quarter. The house is situated on the south 80. On reaching the place,

1. Principal and Agent: authority to sell or find purchaser.

plaintiff undertook to examine the land, for the purpose of determining whether or not he would purchase it. It is the claim of the plaintiff that he did not make a very thorough examination of it. After such examination had been made as plaintiff cared to make,—and it is not claimed that he was prevented from making any further examination of it,— on the way back, he made an offer of $80 per acre. However, he was told by the agents that the land was listed with them at $85 an acre. He returned by way of defendant's home, but did not stop, though the agents did. Subsequently, on the 21st day of September, the defendants and the plaintiff came together, and a written contract was entered into, by which the plaintiff agreed to purchase the entire farm of 240 acres, at $80 an acre, to pay $5,000 in cash, and secure the balance by a mortgage upon the premises, the deeds and mortgages to be executed on the 1st of March following, and possession then given to the plaintiff. On the 25th day of February, 1915, the plaintiff, having paid the $5,000 provided for in the contract, executed and delivered to these defendants his note for the unpaid balance of the purchase price, and secured the same by a mortgage upon the premises. Thereupon, the defendants executed and delivered to the plaintiff a deed to the land, and on the 1st day of March, plaintiff took possession and continued in possession personally until some time in July, 1916. The record does not affirmatively show, but we take it from the record, that he has been in possession by others since that time. At least, it does not appear that he has surrendered possession to the defendants. It appears that, when the contract was drawn up, it was supposed that the farm contained 240 acres, but it was subsequently discovered that it was 7 acres short. Some time in January, 1915, a survey was made by the plaintiff and the defendants, and 7 acres agreed upon as the shortage in the acreage of the farm, and $560, or $80 an acre, was deducted from the contract price

on account thereof, and the note and mortgage were made for $560 less than the contract called for.

On the 18th day of February, 1916, this action was brought to recover damages which the plaintiff claims he has sustained by reason of certain false and fraudulent representations made, touching the character of the land purchased. He claims that, when visiting the land for the first time with these agents, he asked one of them, while on the farm, what kind of soil it was, and the agent replied, "black, sandy loam." He asked him if the ground overflowed, and he said, "No, it never overflowed." His action for deceit is based on the ground that it was not black, sandy loam, and it did overflow, and that these representations were made by these agents for the purpose of having him believe that it was black, sandy loam, and did not overflow; that he did so believe, and, relying upon these statements, was induced to purchase the land. He further says that the defendants and their agents knew that the representations were not true. He wants damages in the difference between what the land would be worth if it had been as represented, and what it was in fact worth; says that it would have been worth what he agreed to pay, had it been as represented.

At the conclusion of the evidence, the court directed a verdict for the defendants. Judgment being entered upon the verdict, plaintiff appeals.

It is apparent from this record that these agents had no relationship with the defendants except that which grew out of their agency. The agency was to sell at $85 an acre, or to procure a purchaser who was ready, able, and willing to buy the land on terms satisfactory to the defendants. The agents did not sell the land, but they did find in the plaintiff a purchaser who was ready, able, and willing, and who did buy the land on terms satisfactory to the defendants. There is nothing to show express authority, on the part of these agents, to make any representations touching the

character of the land.  Is it implied?  So far as this record shows, their business was to sell, or to secure a purchaser who was ready, able, and willing to buy the land in its *then condition*, on terms satisfactory to the defendant.  They found this plaintiff, took him to the land, showed it to him, and informed him that they had it for sale at $85 an acre. Plaintiff proposed to purchase the land, as he says, for $80 an acre, if it was as represented by these agents, to wit, to be sandy loam, free from overflow.  Subsequently, the plaintiff and these defendants met, and the terms were arranged upon which the plaintiff should purchase.  Nowhere in the negotiations with the defendants were the defendants informed by anyone that any representations had been made to the plaintiff touching the character of the land.  They were informed, however, that the plaintiff had been to examine the land.  Defendants accepted plaintiff's proposition as he made it to them.  It does not appear that these agents had anything to do with the making of the contract on the 21st day of September.  The question then is, so far as this proposition is concerned:  Are the defendants liable in damages on account of these fraudulent representations made by these agents, it not appearing that they were made with the express authority of these defendants, or that they were ever brought to the knowledge of the defendants before the consummation of the final contract and the surrender of the property to the plaintiff?

We may assume, for the purposes of this case, that these agents made the representations substantially as claimed.  We may assume that the representations were not true.  We may assume that the plaintiff believed they were true, and relied upon them in making the purchase.  There is no evidence that the agents knew that their representations, if made, were not true, but we may assume that they did know they were not true.  We may assume that plaintiff made his proposition to the agents to purchase at $80

an acre, on the assumption that these representations were made, and were true. The question still remains: Are these defendants liable in damages as for deceit in the making of these representations?

It is not claimed that, when plaintiff came to make the contract with the defendants, he said anything to them touching these representations, or asked any questions of them, touching the character of the land. It is nowhere shown that he said to these defendants that the condition upon which he was making the purchase was that these representations were true. The record is barren even of suggestion of knowledge on the part of these defendants of the making of these representations. Were the representations so connected with the employment as to be binding upon these defendants? It is undoubtedly true that whatever an agent says or does, within the scope of his authority, binds his principal, and is deemed his act. The authority must be either express or implied,—expressly given or implied from the relationship created and existing. Had these agents the authority from these defendants to represent the land to be other than it was? Their authority was simply to make a sale, or procure a purchaser who was ready, able, and willing to buy. The plaintiff was procured by the agents as one who was ready, able, and willing to buy at a stipulated price. The price was stipulated by the plaintiff himself. He was brought by these agents to the defendants, and with them the contract was made. He gave the defendants no information touching any representations made, nor did he give them any information that he was buying on condition that the representations made were true. The scope of the agents' authority was to sell, or to procure a purchaser for the land. Thus far, they bound their principal by their acts. They could not bind him by untruthful and unauthorized representations touching the character of the thing which they were authorized to sell.

The authority to make these representations was not necessarily included within the terms of the agency. The representations, to bind the principal, must appear to be representations which the agent, by his employment, was authorized to make. It is a general rule, well recognized, and is an exception to the rule of *respondeat superior*, "that a principal is not responsible for the deceit practiced by his agent, unless there is something in the nature of the engagement, the terms of the employment, or the powers conferred, broad enough to include a power on the part of the agent to deal with the property in such manner that the principal, in good morals and equity, ought to be bound by what the agent may have said." Or, in other words, an innocent principal, who has simply authorized an agent to sell property, cannot be charged, on an action for deceit, for the agent's wrongs, unless in some manner he is connected with them. *Kennedy v. McKay*, 43 N. J. L. 288; *Titus v. Cairo & Fulton R. Co.*, 46 N. J. L. 393; *State v. Fredericks*, 47 N. J. L. 469 (1 Atl. 470); *Tondro v. Cushman*, 5 Wis. 279; *Mayo v. Wahlgreen*, 9 Colo. App. 506 (50 Pac. 40); *Samson v. Beale*, 27 Wash. 557 (68 Pac. 180).

A fraud, to be actionable, must be fraud that is either personally committed by the person sought to be charged, or some fraud which he has authorized another, either directly or impliedly, to be guilty of. The action here is based upon fraudulent representations made by the defendants. The defendants made no fraudulent representations before this written contract was entered into. They never knew the representations were made, until after the original written contract had been fully executed. All that these defendants did was to authorize these agents to sell this land, or to procure for them a purchaser. It has been frequently held by this court that, where the authority is limited to the finding of a purchaser, the duty of the agent is performed when the purchaser is produced. When the agent

procures a purchaser ready, willing, and able to buy on the terms proposed, or on terms satisfactory to the seller, he has done all that his contract calls on him to do; all that his contract authorizes him to do. Representations made by an agent possessing this limited authority, touching the character of the property offered for sale, are not binding upon his principal. The general rule seems to be that an agent whose power is restricted to the sale of a tract of land at a given price, has no power to bind his principal by representations as to the quantity or quality of the land. This is not within the scope of the powers conferred. The rule is that false representations made by an agent at the time of the bargain, although unauthorized by his principal, may release the purchaser from his contract on the ground of fraud or deceit, solely on principles recognized in equity; but such fraud does not lay the basis for an imputation of wrongdoing on the part of the principal, subjecting him to damages as for deceit. *National I. A. Co. v. Bruner & Baxter*, 19 N. J. Eq. 331.

*Kennedy v. McKay*, supra, was a suit bottomed on an alleged fraud committed by the defendants in the sale of 40 shares of stock. The deceit consisted in unfounded representations as to the financial condition of the company. The stock stood in the name of one McKay. The court said:

"But even if we were to assume that this stock was, in reality, the property of McKay, and that Halliard and Reid were his agents to make sale of it, still it is not apparent on what legal theory this present action could be sustained. To support this suit against McKay, fraud must be imputable to him, and the case is entirely destitute of all testimony tending to show that he authorized or was privy to the utterance of the false representations in question. On the ground thus assumed, then, the case would be that of a sale made by a fraud-doing agent in behalf of an innocent vendor. Whatever uncertainty may at one time have pre-

vailed in regard to the legal incidents of such a position, such uncertainty no longer exists, and the rights, under the given circumstances, of both vendor and vendee, have been plainly defined, and, as I think, firmly settled by recent judicial decisions. In the light of such authorities, it is clear that an innocent vendor cannot be sued in tort for the fraud of his agent in effectuating a sale. In such a juncture, the aggrieved vendee has, at law, two, and only two, remedies; the first' being a rescission of the contract of sale, and a reclamation of the money paid by him from the vendors, or a suit against the agent, founded on deceit. But in such a posture of affairs, a suit based on fraud will not lie against the innocent vendor, on account of the deceit practiced, without his authority or knowledge, by his agent. If the situation is such that the vendee can make complete restitution, so as to put the vendor in condition with respect to the property sold that he was in at the time of the sale, he has the right to rescind such contract of sale, and if the vendor, on a tender to that effect, refuses to return the money received in the transaction, a suit will lie for such money, but such refusal on the part of the vendor will not make him a party to the original wrong, so that he can be sued for the deceit."

As supporting this, see *Udell v. Atherton,* 7 Hurlstone & Norman's Reports 172. This was an action to recover damages for deceit on account of false representations made by an agent. Martin, B., speaking for the court, said:

"The allegation in the declaration upon which the plaintiff's right of action rests is that *the defendants made a false and fraudulent representation.* But how can it be said with truth that the defendants made such a representation? They themselves never made it; they never authorized Youngman to make it; they never knew of it until long afterwards, and until after the contract had been executed. All they did was to authorize Youngman to sell the log honestly.

No doubt they afforded the occasion upon which the fraudulent representation was made, but they did nothing more; and in my opinion, this is too remote to render them liable to this action. Youngman, however, is clearly liable upon the facts as assumed, and if he be a solvent man, the plaintiff may obtain from him the redress to which he is entitled. I do not think the circumstance that he possibly may be a person not capable of paying damages, is one which can legally be taken into consideration in order to determine the liability of the defendants. The ability to pay does not affect the question of legal liability for a wrong."

See, also, *Western Bank of Scotland v. Addie,* L. R. 1 Scotch & Divorce Appeals, 145.

Under these authorities, we hold that statements made by these agents touching the character of the land, never having been communicated to the defendants, do not lay the foundation for an action based on deceit as against them, and upon this proof alone, the court would be right in sustaining defendants' motion for a directed verdict. The testimony, however, tends to show that, after the written contract was entered into, and some time in January following its execution, the plaintiff and one of the defendants were on the land for the purpose of ascertaining whether there was any shortage in the acreage as claimed by the plaintiff. It is claimed that defendant said to the plaintiff at this time that the farm never overflowed. Plaintiff testifies that he would not have subsequently consummated the contract, had this statement not been made. However, we think this fraud was not alleged or relied upon in the petition, and recovery can be had upon no fraud practiced which is not relied upon in the statement of plaintiff's cause of action. The petition alleges that, to induce the plaintiff to purchase said land, the defendants, by themselves and their agents, orally represented to plaintiff that

2. FRAUD: unpleaded but proved fraud.

said land was black sand, and that said land did not over-
flow; that said defendants and their agents made said rep-
resentations to the plaintiff to be believed by him; that the
plaintiff did, in fact, believe such representations, made by
the defendants and their agents, and relied upon them in
purchasing the land; and said defendants and their agents
knew that said representations were, in fact, believed by
the plaintiff; and that they well knew that said land was
not black sand, and well knew that said land overflowed; that
the negotiations finally culminated in the contract, hereto-
fore referred to, entered into on the 21st day of September,
1914. This fraud, if any, not being pleaded and relied upon
as a basis for recovery, proof of it affords no ground for re-
lief. It is apparent from the pleading that this statement,
made by this defendant, appearing only in the evidence, was
not in the mind of the pleader at the time the petition was
prepared, and is not the fraud relied upon in the petition
for recovery. The petition recites the fraud which it is
claimed was perpetuated, the misrepresentations which it is
claimed were made and relied upon, and says that the fraud
relied on is that which induced and led the plaintiff up to
the making of the contract on September 21, 1914. It says
that the negotiations, reciting the fraud practiced in the ne-
gotiations, fostered and encouraged, finally culminated in
the execution of the contract on September 21, 1914.

It is next contended that, inasmuch as the plaintiff vis-
ited the farm before making his purchase, saw the land and
the character of the land, went there for the purpose of in-
specting the land, and, after inspection, fixed
his own price upon the land, he cannot be
heard to say that he relied upon any repre-
sentations made to him, touching the char-
acter or quality of the land. It appears that the plaintiff,
with his son, who was 18 years of age, went to this land in
September, for the purpose of examining it and determining

3. FRAUD: examin-
ation as exclud-
ing reliance on
fraud.

from an examination whether it was land they desired to buy. Plaintiff had been the owner of land in this same county, not far distant from this land. He had sold for $180 an acre. He said he desired to buy cheaper land. When he saw this land, it was in his mind to buy cheaper land. No obstacles were thrown in the way of his inspection. He did, unquestionably, examine a portion of it. He again visited the land on Thanksgiving, and again in December or January. On the 25th day of February, he consummated the contract by accepting a deed and executing to the defendants a note and mortgage for the unpaid purchase price. On the 1st of March, he took possession, retained possession, and made no complaint until some time in January, 1916.

On this fact question, we think a case was made for the jury, though it is exceedingly close to the line, and is not free from doubt.

While we find the plaintiff not entitled to recover damages against the defendants as for deceit, on account of the fraud practiced by their agents, the question still remains, Is the plaintiff without right in this action?

4. VENDOR AND PURCHASER: vendee injured by unauthorized fraud. Is he without some right which the court will recognize and enforce?

As said before, the contract was consummated in February, 1915, the note and mortgage given, and the deed executed, and on the 1st of March, the land was turned over to the possession of the plaintiff. It appears, however, that, on the 15th day of January, 1916, after the consummation of the deal, the plaintiff wrote the defendants the following letter, properly addressed to them:

"I bought this land up north of Palo from you, on your statements that it was black, sandy loam, and that the land did not overflow. It is not black, sandy loam, and 60 acres of the land are under water constantly, and 160 of it has been overflowed this year, several times, so as to prac-

tically prevent its use for anything.  I write this letter to give you an option to return me my money and take a quit-claim for the land, or to give me credit for the overflow acreage at the price of $80 an acre on the mortgage which you hold."

The jury might well find that this letter was written within a reasonable time after the plaintiff had discovered that the statements made by the agents touching the character of the land were not true.  It gave to the defendants the option to call the contract off, or to pay to the plaintiff the difference between what the land was actually worth and what the plaintiff had contracted with the defendants to pay them for the land.  Nothing seems to have been done by the defendants in response to this letter.  We must assume that the defendants elected to retain the fruits of the fraud practiced by their agents.

On the 18th day of February, this action was begun. If the testimony of plaintiff's witnesses is to be believed,— and for the purposes of this case we must assume that their statements are true,—the land, in the condition in which it was, was not worth on the market more than $30 an acre. If the plaintiff's testimony is reliable, and it was for the jury to say whether it was or not, the plaintiff, through the fraud of the agents of the defendants, was induced to obligate himself to pay $50 an acre more for this land than it was actually worth.  Defendants are, therefore, holding from the plaintiff money which they obtained through the fraudulent practices of their agents, far in excess of the value of the thing which plaintiff received in the transaction.  It is not a violent assumption to say that, had the plaintiff known that the land was not as represented, he would not have bound himself to pay this large sum of money to the defendants for the land.  While we hold that, in an action for deceit, strictly construed, the plaintiff is not entitled to recover damages of the defendant, based solely on the false

representations of his agents touching the character of the land, because the enforcement of such a rule would inevitably work great hardship on the innocent seller, and compel him to pay damages for a wrong to which he was in no way a culpable party, yet a different rule obtains when it is shown that the sum obtained through this fraud is far in excess of the value of the thing, and the action is to recover the excess only. If the purchaser, after he acquires knowledge of the fact that the buyer was induced to make the purchase and pay the price through fraud practiced on him by the defendant's agent, insists on holding the fruits of the fraud, an action will lie for the money so fraudulently obtained and withheld. The wronged party has two remedies. He may rescind the contract, tender back the property, and recover the amount which he agreed to pay, or he may offer rescission, and, if the offer be refused, maintain an action to recover the difference between what he contracted to pay, or did pay, and the actual value of the thing which he received. Or, in other words, the seller cannot retain the fruits of the fraud and repudiate the fraud at the same time. The fruits of the fraud are the difference between what the thing was actually worth and what the purchaser was fraudulently induced to pay for the thing. The wording of plaintiff's petition does not clearly indicate on which of the two theories he was prosecuting his suit. In construing the petition most favorably to the plaintiff, it can be said that the suit was to recover the difference between what he paid for the land and what the land was actually worth. To allow the plaintiff to recover the difference between what the thing sold was actually worth, and what he agreed to pay for it, is not mulcting the defendants in damages. It is requiring them to disgorge only so much of the purchase price as they obtained through the fraudulent representations of their agents. The seller cannot retain the fruits of the fraud, and at the same time repudiate

the fraud; or, as some of the books say, he cannot repudi-
ate the fraud and yet hold onto its profits.

The authorities are not as one upon this proposition.
See 2 Corpus Juris 858, where the authorities pro and con are
collated; *Shepard v. Pabst,* 149 Wis. 35 (135 N. W. 158);
*Gunther v. Ullrich,* 82 Wis. 222; *McKinnon v. Vollmar,* 75
Wis. 82; *Law v. Grant,* 37 Wis. 548; *Bennett v. Judson,*
21 N. Y. 238; *Rhoda v. Annis,* 75 Me. 17 (46 Am. Rep. 354);
*Hoyer v. Ludington,* 100 Wis. 441.

Upon this theory of the case, we think the court was
wrong in directing a verdict for the defendants, and for
that reason, the case is—*Reversed.*

LADD, C. J., EVANS, PRESTON, SALINGER, and STEVENS, JJ.,
concur.

WEAVER, J. (concurring). I concur in the opinion pre-
pared by Mr. Justice Gaynor that this case is one for revers-
al, as well as in his statement of the proper rule for the ad-
measurement of the plaintiff's damages. My disagreement
with the opinion goes only to the discussion which precedes
the words, "As said before, the contract was consummated in
February, 1915," etc. A reading of the opinion will show
that the discussion to which I refer is not at all vital or nec-
essary to the disposition of the appeal; and, such being the
case, I would not encumber the record with an expression of
disagreement, were it not that, when our decision takes its
place as a precedent for the guidance of the profession and
the courts of the state, silence upon the subject by other
members of the court is liable to be construed into an ap-
proval of all that is there said.

I have specific reference to the propositions therein
mentioned, and summed up in the statement that, to bind
the defendants by the false representations of the agent, the
"representations must appear to be those which the agent,
by his employment, was authorized to make," and again:

"He [the agent] could not bind his principal by untruthful and unauthorized representations touching the character of the land he was authorized to sell." As I have already sug-gested, this discussion, in view of the result, is dictum, or matter merely *arguendo;* but, to avoid any misunderstand-ing, it is proper that it be accompanied by my contention that the rule so asserted is opposed to the whole current of the law on that subject. Indeed, aside from a few cases in New Jersey, all the authorities, including text writers, courts, and annotators, are practically unanimous in hold-ing to the doctrine which is expressed in 1 Am. & Eng. Encyc. of Law 1158, 1159, as follows:

"The principal is liable for the fraudulent act of his agent in the course and within the scope of his employment though in fact the principal did not authorize the practice of such acts. * * * The fraudulent representations of an agent acting in the course of his employment and in refer-ence to business within the scope of his authority will be binding upon the principal, although, in perpetuating the fraud, the agent acted without the knowledge or consent of the principal."

The same proposition is affirmed in 2 Corpus Juris 856; 31 Cyc. 1582; Benjamin on Sales (7th Ed.) Sections 462–467; 1 Clark & Skyles on Agency 1102; Story on Agency (9th Ed.) Section 452; 21 R. C. L. 850; *Lloyd v. Grace S. & Co.,* A. C. (1912) 716 (Ann. Cas. 1913B, 819); *Franklin F. Ins. Co. v. Bradford,* 201 Pa. St. 32 (50 Atl. 286, 88 Am. St. 770 [and see note to same case in same volume, page 787]); *Law v. Grant,* 37 Wis. 548; *McKinnon v. Vollmar,* 75 Wis. 82; *Hoyer v. Ludington,* 100 Wis. 441; *Heiddegger v. Burg,* 137 Minn. 53 (*Carlson v. Burg,* 162 N. W. 889); *Rush v. Leavitt,* 99 Kan. 498 (162 Pac. 310). Citations of other authorities to the same effect could be extended quite indefinitely. The distinction sought to be drawn between the principal's liability "as for deceit," and

his liability for damages if he retains the fruits of the agent's fraud after notice thereof, is one of mere words, and not of substance, when we consider our practice, which recognizes no "forms of action." The petition in this case did charge fraud and misrepresentation by the defendants and their agents, and that, by means thereof, plaintiff had sustained large damages, and that defendants had refused to accept a rescission of the deal, or to pay the damages. It may be conceded that, in so far as he charged misrepresentation of the character of the soil, he did not make a case; but there was ample evidence of misrepresentation of the liability of the land to overflow, and that, by false statements in this respect, the property was foisted upon plaintiff at a price more than twice what it was worth. Having offered evidence clearly sufficient to take that issue to the jury, it is wholly immaterial whether defendants are chargeable for damages "as for deceit," or because they have ratified the fraud of their agents by approving the sale they had negotiated, or because they cannot be permitted to retain the fruits of the fraud practiced by them, and at the same time deny their liability for the injury so perpetrated upon the plaintiff.

For these reasons, and because I believe much of the language employed in that part of the opinion to which I have objected opens the gate to a wide departure from well-settled and salutary rules of law, I do not wish to be bound thereby.