## MAYO ET AL. v. WAHLGREEN.

1. DECEIT—EVIDENCE.

At the trial of an action for deceit, the plaintiff introduced evidence respecting statements by one of the defendants concerning the value of the property sold. The defendants were not permitted to show that these representations were true. *Held*, erroneous.

2. SAME—AGENCY.

Generally, a principal is not responsible for the deceit practiced by his agent, unless there is something in the nature of the engagement broad enough to include a power on part of the agent to deal with the property in such manner that the principal in good morals and equity ought to be bound by what the agent may have said. An innocent principal, who has simply authorized an agent to sell property, cannot be charged in an action of deceit for the agent's wrongs, unless in some manner he be connected with them.

3. SAME.

In the absence of confidential relations between the parties, an action for deceit cannot be predicated upon the seller's extravagant statements of the value of the property sold, or in respect of the possibilities or probabilities in connection therewith.

4. SAME.

If M., having an option to purchase property at $100 per acre, should, to induce W. to join him and others in its purchase at $150 per acre, state to W. that he should "come in on the ground floor" and share equally with him in the advantages resulting from the enterprise and purchase, and the language was used and understood by the parties to mean that they should purchase on the same terms as M., and the agreement was so understood and accepted by W., the representation would, upon proof of its falsity, be a misrepresentation on which an action of deceit might be maintained.

5. MEASURE OF DAMAGES.

If M., having a right to buy land at $100 per acre, falsely represented to W. that he was to pay $150 per acre therefor, and by such misrepresentation induced W. to join in its purchase at the last named price, the measure of damages would, in an action of deceit by W., be the difference between these prices, regardless of the actual value of the land.

6. SAME—INTEREST.

The circumstances of this case seem to bring it within the exception to the rule that in the absence of a statute permitting interest to be recovered, it may not generally form a part of the damages which the injured party may recover.

*Appeal from the District Court of Arapahoe County.*

Mr. GEO. C. NORRIS, for appellants.

Mr. CLAY B. WHITFORD and Mr. H. A. LINDSLEY, for appellee.

BISSELL, J., delivered the opinion of the court.

It is not infrequently useful to define and classify the action which is the subject-matter of an appeal, for it serves to limit the application of what is held to be the law and to facilitate its apprehension. This is an action in deceit. The plaintiff's cause depended on proof of material representations, their falsity, and his damage.

A little history outside of the matters necessarily involved in the suit will tend to present the real issue with greater clearness. Early in the year 1889, the Denver Chamber of Commerce initiated a plan to create a summer resort. The persons in charge of the enterprise selected as the place of the resort Lookout Mountain, which is a few miles west of Golden, and in the foothills. A corporation was organized called "The Denver Lookout Mountain Resort, Land, Transit and Improvement Company." Another corporation was then organized, known as "The Denver, Apex and Western Railway Company," to build a railroad from Denver to the resort and other places. Upon the organization of these two corporations, the Lookout Mountain Company bought a large tract of land of one of the defendants and appellants in the present suit, Abraham L. Hess. The company bought 680 acres of him on the mountain for $10,000. Hess was an old time resident in the country, and had lived in the vicinity of

Mt. Vernon Gulch, near the mountain, since 1870. On the
completion of this purchase and the commencement of work
by it, a boom of extraordinary and unwarranted proportions
sprung into life in this vicinity. The apparent values of all
lands increased, and many people who were dealing in real
estate, and those who were residents there, commenced pick-
ing up different pieces of property, procuring options on
them, purchasing them outright, and holding them for the
purposes of the profit which might result from their resale.
Hess bought other property, got options on some, and finally
obtained, in the fall of 1889, a title to forty acres of land
which had theretofore belonged to Mr. Craig, and was a part
of the estate left by him at his death. The history of the
acquisition of that title need not be given. It is enough to
state the ultimate fact that the title to the property became
vested in Hess prior to the making of the contracts and
transfers which led to the present suit. Hess paid $31.25 an
acre for the land. The other appellant, Mayo, was some-
what familiar with the locality, had been there in the summer
time to spend part of his vacation, and had considerable
knowledge of the situation of the property. He was infected
with the mania which seized all who went into the specula-
tion, and after making several attempts to secure options on
properties, negotiated with Hess with reference to this par-
ticular forty. These negotiations culminated in an agree-
ment between Mayo and Hess, which was expressed in two
papers which were produced in evidence, although the main
features of both were the same. These papers were executed
in February, 1890. The month was given, but no definite
date was put in either. According to the terms of the one
which was said to have been executed first, Hess authorized
Mayo to sell the forty acres of land described, and make
whatever profit he could, provided Hess received $4,000 for
it; $1,000 in cash, $1,000 in six months, $1,500 in twelve,
and $500 in eighteen months thereafter. The deferred pay-
ments were to be secured by trust deed and were to bear
interest. The other paper was an agreement to sell the forty

acres of land to Mayo and to three other parties one individual quarter. The consideration was to be $500 cash, $500 in six and $500 in twelve months. The only substantial difference between the two papers was in the price per acre which Mayo was bound to pay; the first being $100 an acre, and the second $150. It is quite clear from the testimony the agreement first referred to was the one which was originally executed by the parties, and contained the exact agreement between them, to wit, that Hess had agreed to sell at $100 an acre, payable at definite dates, and in entirety was to receive $4,000 as the consideration money. The purpose of the execution of the second option is not clear from the testimony, for the witnesses were not totally disingenuous in their statements; but we regard this as unimportant, because, according to Wahlgreen's testimony, he knew nothing of either of the papers. For this reason the matter will not again be referred to, and it is simply stated as explanatory of the situation. After Mayo had made this agreement with Hess, he attempted to find other parties to help him carry out the contract, for he was without the capital requisite to take the forty acres at $4,000, and according to the contract the whole only could be taken, and it could not be subdivided and sold in sections as against Hess, the owner. Mayo approached divers parties, and finally succeeded in procuring Wahlgreen, Hassel, Walker, and Nightengale to take portions of the forty acres, and thus complete the purchase. It was originally intended that each party should take ten acres, but Wahlgreen was unable to take more than five, and his interest was reduced accordingly. Contracts were executed by Wahlgreen, Hassel, Walker and Nightengale running to Hess, and contained stipulations that the parties should take certain specified proportions of the tract and pay a designated price, which was at the rate of $150 an acre, paying a certain percentage of cash and the balance by notes secured by trust deeds on the property. The parties came together, and, to determine which particular portion of the forty acres each should have, their rights were decided by

lot, and when this was settled, the purchasers paid the cash
agreed on, gave the notes and trust deeds, and took title to
their portions in severalty. Wahlgreen paid the cash con-
sideration, gave his notes, and took his deed. By some in-
advertence the deed which was executed did not correctly
describe the part he took, and after differences had arisen
between the parties, Hess executed a new deed with the cor-
rect description, and left it with Wahlgreen, who put it on
record. When the notes matured Wahlgreen paid them
with the interest, and afterwards brought this suit. We
have thus far omitted to state the gravamen of the action
because it would less clearly appear if put in its chronolog-
ical position in the case rather than as the conclusion of its
history. During the time Mayo was negotiating with Wahl-
green and attempting to induce him to buy part of the prop-
erty, he made sundry statements respecting its situation, its
value, both present and prospective, the existing condition
of affairs at the resort, and the terms on which Wahlgreen
was to be taken into the scheme. Wahlgreen learned that
he had paid more for his proportion than the sum at which
Hess had agreed to sell it to Mayo, concluded that he had
been defrauded in the transaction, and brought this suit
against both Hess and Mayo. He charged that Mayo had
particular knowledge respecting the situation and value of
the property, and that he represented it to be worth a very
large sum beyond its actual value; that a great amount of
work was being done by the Resort Company to improve its
property and prepare for the erection of a large hotel at the
resort; and particularly charged that in the negotiations
between him and Mayo, Mayo agreed and represented that
if Wahlgreen took an interest in the purchase of any part of
his forty acres, he should come in on the ground floor with
him as a purchaser. These were the specific representations
charged which were alleged to be false, to have misled the
plaintiff, and to have caused him damage. During the trial
Wahlgreen testified that he never saw Hess from the time
he first begun talking about the purchase until after he had

agreed to buy it, and up to the time the money was paid, the notes given, and the deed secured. It is very clear from the testimony that Hess had nothing whatever to do with Wahlgreen, or with any of the parties who united in buying this forty acres, other than to execute the deeds, take the consideration money and notes as the parties paid and delivered them under the contracts. The testimony of Hassel and Walker was offered, and it tended to establish, as between Mayo and each one of those parties, a transaction very similar to that detailed by Wahlgreen. All agree, however, that the trade was carried on by Mayo, and that they had nothing whatever to do with Hess, and that he was unknown in the transaction until the time mentioned. Hess likewise testified that he knew nothing of Mayo's negotiations, and that his agreement with Mayo was simply to sell the property at a definite price and on fixed terms. The testimony tended to show that prior to the time of the completion of the agreement Wahlgreen went to the locality to look the ground over and failed to see the teams which were reported by Mayo as at work on the resort property, remarked about it, and was told by Mayo that they were probably beyond and over the hill. During the progress of the trial, the plaintiff introduced testimony respecting Mayo's statements concerning the value of property and the price at which property was sold in that vicinity, but when the defendants came to their proof, they were not permitted by the court to show the representations in this respect to be absolutely true. There was evidence given by them in this direction, but some of it was excluded. This is not referred to as an error for which the case would be reversed, but as a basis for a suggestion respecting it by which the court will be aided in the subsequent trial. In the statement of the case and the proof, we have confined ourselves within as narrow limits as were consistent with perspicuity, because the case must be again tried, and it is to the interest of the parties that the opinion of this court respecting the character, extent, weight or value of the testimony should be entirely

concealed.   Enough has been stated on which to rest our decision.

Departing, perhaps, from the lines into which the case would naturally fall, we will first dispose of that branch of it which concerns the appellant Hess.   The definition with which the opinion started, coupled with the proof, disposes of the judgment as against Hess.   This was said to be an action in deceit.   It was brought to recover the damages resultant from the misrepresentations made by Mayo to Wahlgreen, whereby he was induced to purchase the property to his injury.   Hess had no connection with the negotiations which led up to the making of the contracts by Wahlgreen, nor any interest in the trade except to receive the price for which he had agreed to sell it to Mayo.   Wahlgreen testified that he never saw Hess at all, and the latter gives evidence that he knew nothing of the negotiations between Mayo and Wahlgreen, had no knowledge of the statements which he made to induce the sale, and gave to Mayo no authority whatever to make any representations respecting the price, value, or situation of the property other than what might appear from his agreement to sell it for $4,000, payable at stated times.   From this it is very evident Hess is not responsible for the representations which Mayo made to Wahlgreen, unless there is something in the situation or in the relations between Hess and Mayo which would charge him with that responsibility.   For many reasons this cannot be true.   In the first place, Mayo was never Hess's agent to sell the property, according to the well-understood meaning of the term "agent."   It may be he was in one sense an agent, in that Hess authorized him to sell it for $4,000, but he was not an agent in the sense of having been employed by Hess to make the sale on his account and for his benefit. According to the arrangement between Hess and Mayo, Hess could never become liable to Mayo for his services in the premises, whether he did or did not sell, and the transaction lacked all the elements of employment which, as a general proposition, are essential to the establishment of an existing

agency.   As we view it, Mayo was not an agent at all, but simply a person with the right of disposition, providing he paid Hess the price agreed on.   It was more in the nature of an option, as it was expressed by the second agreement, than anything else.   Probably this alone would relieve Hess of any liability, but there are other considerations which are equally persuasive.   As a general proposition, a principal is not responsible for the deceit practiced by his agent, unless there is something in the nature of the engagement, the terms of the employment, or the powers conferred, broad enough to include a power on the part of the agent to deal with the property in such manner that the principal in good morals and equity ought to be bound by what the agent may have said.   There are many cases which hold the principal responsible for the fraud and misrepresentation and acts of the agent when he accepts the fruits of the contract, and refuses to surrender.   As the cases put it, he may not be permitted to reap the harvest and refuse to pay for the seed. When those decisions are examined, it will be seen there was an attempt on the part of the vendee to rescind the sale, and, the vendor refusing, he was held liable for the representations.   In all of them the responsibility of the principal is put upon this basis.   Where, however, there is no attempt on the part of the vendee to rescind, but he affirms the sale, he can bring his action for deceit only against the agent, who has been guilty of the misrepresentations, unless he is able to trace some connection between the principal and the agent, and thereby charge the former with responsibility for what the agent may have said or done.   An innocent principal, who has simply authorized an agent to sell property, cannot be charged in an action of deceit for the agent's wrongs unless in some manner he be connected with them.   This distinction is recognized, and the doctrine commends itself to our judgment.   *Kennedy v. McKay et al.*, 43 N. J. Law, 288; *Titus v. Cairo & Fulton R. R. Co.*, 46 N. J. Law, 393 ; *Decker v. Fredericks*, 47 N. J. Law, 469.

    Unless proof be offered which shall require the application

of a different principle, Hess cannot be held responsible for the misrepresentations charged by the plaintiff. Since the verdict and the judgment were joint against Mayo and Hess, this error would compel us to reverse the case; but as it may be again tried, we are compelled to notice other questions suggested by the record.

A very large proportion of all the errors assigned are predicated on the instructions. The charge was voluminous, covered many specific propositions, and some of them cannot be successfully defended. It will be more satisfactory, however, to notice the legal propositions and state the rules by which the court must be governed in a retrial of the case, rather than to review each instruction and point out wherein the error lies. The discussion of the case will necessarily settle the law of it, and thereby the errors which were committed on the former trial will be easily and readily avoided. The appellants complain of the proof offered respecting Mayo's statements of the value and situation of the property, and the amount of work which was being done at the resort when the contract was made. It is earnestly insisted that the expression of an opinion about the value of property, even though untruthful, is not a matter which will serve as a basis for an action of deceit, because a vendee is bound to use his own judgment and his own eyesight in order to settle such questions, unless there be something in the relation of the parties which excuse him from the exercise of common diligence. This rule has been recognized in many cases. Extravagant statements of value, possibilities or probabilities have been allowed to go by unchallenged. There has been no departure from this doctrine in the courts of this state, and the courts have followed the text-books and adjudicated cases, and have denied relief to a plaintiff who complains of a misrepresentation or statement of value. *Sellar et al. v. Mc-Clelland*, 2 Colo. 532; *Wier v. Johns*, 14 Colo. 493; *Beard v. Bliley*, 3 Colo. App. 479; *Baum v. Holton*, 4 Colo. App. 406; *Tuck v. Downing*, 76 Ill. 71; *Banta v. Palmer*, 42 Ill. 99; *Salem India Rubber Co. v. Adams*, 23 Pick. 256; *Starr v. Bennett*, 5 Hill, 303.

We are- unable to discover anything in the record which takes this case out of the general rule. Counsel for appellee seek to bring this case within the exception, which is some-times stated, that where there is a confidential relation exist-ing between the parties, or matters are peculiarly within the knowledge of the person making the statements, the party to whom they are made may rely on them, and if he suffer dam-age recover accordingly. There is nothing in this case to bring it within that exception. There was no confidential relation existing between Mayo and Wahlgreen, and never had been as the law defines that relationship. There had been no other connection, business or otherwise, between the parties except that of music teacher and adult scholar, which had terminated long before this transaction. There is noth-ing in the relation between music teacher and adult scholar which the law would term confidential, nor is there anything between two men occupying such a position to which these consequences should be attached. Nor are we able to dis-cover anything in the record to show that Mayo had special facilities to obtain information which were not open to Wahl-green. We see no reason why Wahlgreen, as a business man of mature years, had any right to rely on Mayo's statements, and make no inquiry respecting their truth or their falsity. The property was close to Denver and of easy access. The corporations engaged in the promotion of the original enter-prise and the people connected with them could be readily found and their plans and purposes easily ascertained. Prop-erty in that vicinity was being largely dealt in by real estate dealers in Denver and Golden, and slight inquiry would have enabled Wahlgreen to find out the prices at which property was selling, and at which it had been sold and handled in that locality. We find nothing in the case which justified Wahlgreen to rely on Mayo's statements respecting the value of the land, or the work that was being done, and to refuse to use his own eyes and exercise his own abilities to ascertain whether the statements were true. As the case now stands, no representation was made, which, if untrue, would result

in damage and a cause of action, except the statement, which Mayo admits, that, to induce Wahlgreen to go into the enterprise and join with him and others in purchasing the forty acre tract, he should come in on the ground floor and share equally with him in the advantages resulting from the purchase. This representation is on the border line, but we believe it is a matter which should be left to the jury, with proper instructions covering the intent and meaning of the parties in the use of those words. They are without legal significance and have never been judicially defined, yet, in common parlance, they are understood to mean that the parties shall purchase on the same terms. If the jury conclude from the testimony that this was the sense in which the language was used and understood by the parties, and if they believe that when Mayo made this statement Wahlgreen accepted it as conveying that meaning, we should conclude therefrom, the representation having been proven and its falsity established, it was a misrepresentation on which the plaintiff might maintain his suit.

There are one or two other matters about which the court has had even greater difficulty than with those which have been discussed. It is always difficult in these actions of deceit to determine the true measure of damages. Ordinarily, in actions brought to recover damages because of the misrepresentations by which the sale was brought about, the matter is easy of solution, because the general measure undoubtedly is the difference between the actual value of the property sold and the price which the vendee was induced to pay for it. Those are matters of simple computation, and the evidence which is relevant to either side of the issue is readily produced and understood. Manifestly, no such measure can prevail here. The representation which is the gist of the action, and on which, as we decide, it can alone be maintained, was one respecting the basis on which the control of the property had been procured by Mayo and on which the parties were to purchase. When we eliminate Hess from the transaction, the price which he paid is of no consequence

in the settlement of this issue. He agreed to sell to Mayo at $100 an acre, and at that price and sum only could Mayo buy. He was bound to pay that sum himself, whether he paid his own money or induced somebody else to join him in making the purchase. This very clearly demonstrates that the measure of damages is not the difference between the actual value of the property and that which Wahlgreen and his copurchasers paid, because we have a fixed datum by which we are controlled, to wit, $100 an acre. It makes no difference whether the actual value of the property was two or two hundred dollars, Mayo had a right to buy at $100, and if he falsely told Wahlgreen that he was paying $150, and agreed with him that he should buy at the same price, and it was that representation which led Wahlgreen to purchase, then the damages which Wahlgreen sustained was undoubtedly the difference between $100 and $150. We conclude from the peculiar circumstances of this case that such must be the measure of damages. A like rule has been applied in other cases, and it seems to be sanctioned by the authorities. *Bergeron v. Miles*, 88 Wis. 397; *Davenport v. Buchanan*, 61 N. W. Rep. 47; *Shoelkopf v. Leonard*, 8 Colo. 159.

During the progress of the trial the plaintiff offered proof as to Mayo's statements to Hassel and Clark during the negotiations for the sale of the forty acres, but which representations only related, so far as the transaction itself is concerned, to the particular part which Hassel and Clark ultimately bought. The testimony tended to establish statements by Mayo to the other parties in form and substance like that made to Wahlgreen. In further support of the case, a complaint in a suit which had been begun by Wahlgreen against Walker and other copurchasers was offered to show that Mayo was claiming the same identical proportion of the purchase price from Walker that he claimed from Wahlgreen, to wit, the added portion of the purchase price. At first blush the testimony seems a little remote, but much wider latitude is allowed in cases of this description than in the

ordinary action at law upon a contract or a tort other than one based on deceit and misrepresentation. This class of testimony was adjudged proper in a well-considered case, and the decision controls our judgment. *Butler v. Watkins*, 13 Wall. 456.

The jury were charged that if they found for the plaintiff they should find for him in the. difference between $31.25 and $150 per acre, with interest at 8 per cent thereon from the date of payment to the rendition of the judgment. This was error. The question still remains whether the court could legitimately give the jury any instruction respecting the recovery of interest. In this state, in the absence of some statutory provision permitting interest to be recovered, it may not generally enter into or form a part of the damages which a party may receive if he get judgment. This general rule is subject to some exceptions, and we are of the opinion that this case is brought within the exception sanctioned by the supreme court. *Omaha & Grant Smelting & Refining Co. v. Tabor*, 13 Colo. 41; *Shoelkopf v. Leonard*, *supra*.

The damages which the plaintiff sustained, if he is able to convince the jury he was damnified, was the difference between the price which he paid and the sum which he ought to have paid according to the representation. If the subsequent jury should be convinced that this is true, and that he ought to have bought at the same price as Mayo, to wit, $100, the proof remaining the same in this respect, they are at liberty to assess damages to the extent of $50.00 an acre, and may include therein, if they are so advised, as damages and as a part of their verdict, interest from the time of payment until the date of recovery. In other words, this is the true rule and the measure of damages, and within that limit the jury are entitled to find any sum which they may conclude is the damage which Wahlgreen has sustained.

Some other questions have been suggested by counsel in their briefs and argued at some length, but our conclusion respecting these errors must determine the result, and we

think there is enough in the opinion to guide the *nisi prius* court on the subsequent trial.

The cause will be reversed and remanded.

*Reversed.*